IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BROTHERHOOD OF
MAINTENANCE OF WAY
EMPLOYES DIVISION/IBT,

            Plaintiff,

vs.

UNION PACIFIC RAILROAD
COMPANY,

            Defendant.

8:17-CV-217

MEMORANDUM AND ORDER

This case presents a question regarding the arbitrability of a dispute between a railroad and one of its employees' unions. The matter is before the Court on the railroad's motion to dismiss (filing 51) and the union's motion for summary judgment (filing 46). For the following reasons, the Court will grant the motion to dismiss and deny the motion for summary judgment.

## DISCUSSION

This dispute involves the purchase and installation of pre-manufactured rail ties and track panels near Chausse, Idaho. *See* filing 47-1 at 9. The plaintiff, Brotherhood of Maintenance of Way Employes Division (the Brotherhood), is a labor union representing employees of the defendant, Union Pacific Railroad. *See* filing 40 at 2. The Brotherhood and Union Pacific are parties to several labor agreements, two of which are particularly important for purposes of this suit: (1) the February 7, 1965 Agreement and (2) the 2001 Collective Bargaining Agreement (CBA). Filing 40 at 8-9.

The first agreement, the February 7th Agreement, is an industry-wide CBA between the Brotherhood and several rail carriers, including Union

Pacific. Filing 40 at 6; *see also* filing 47-1 at 5. As part of that agreement, the Brotherhood promised Union Pacific that it could "make technological, operation, and organizational changes" to its rail systems so long as the Brotherhood received "at least 60 days' . . . written notice" of the change. Filing 40 at 6; filing 47-2 at 67. And Union Pacific, for its part, agreed to provide more lucrative and protective benefits to the Brotherhood's membership. *See* filing 47-2 at 68-69.

The second agreement, the 2001 CBA, also governs the terms and conditions of employment for the Brotherhood's members. *See* filing 40 at 3. Among other things, work relating to the construction and maintenance of Union Pacific's tracks, including "rail laying, tie renewals, ballasting, surfacing and lining track, [and the] fabrication of track panels . . . ," is reserved for employees represented by the Brotherhood, pursuant to Rule 9 of the 2001 CBA. Filing 47-1 at 16.

It is against that backdrop that this litigation ensued. In February 2017, Union Pacific notified the Brotherhood that it would begin using robotics technology, rather than employees, to perform fabrication work. Filing 47-2 at 86. Specifically, Union Pacific advised the Brotherhood that "technology is being implemented that will eliminate the fabrication steps of affixing plates to ties and panel fabrication (including the drilling, handling the plate, attaching the plate with screws or spikes and other miscellaneous work) which has been performed by your members in the past." Filing 47-2 at 83. In support of that technology use, Union Pacific cited the February 7th Agreement permitting it to make "technological . . . changes" to its operations, and highlighted the parties' past practice allowing, among other things, "the automation of pre-plated switch ties." Filing 47-2 at 86.

On March 10, 2017, the Brotherhood replied to Union Pacific's letter with a letter of its own. In that correspondence, the Brotherhood objected to Union

Pacific's proposal. Filing 47-2 at 87. In response, Union Pacific restated its intent to use pre-fabricated materials, but also noted that implementation of the technology had been delayed. Filing 40 at 13; filing 47-2 at 89. At this point, Union Pacific informed the Brotherhood that "[i]f and when the technology to allow robots to fully plate ties and assemble track panels becomes available for use, [Union Pacific] will advise [the Brotherhood] of that fact" before installing any pre-fabricated materials. Filing 47-2 at 89; filing 40 at 13.

With that understanding in mind, the parties continued business as usual. But in October 2017, the Brotherhood learned that Union Pacific installed "two switches that had been pre-plated" without informing the Brotherhood of its plan to do so. Filing 40 at 13. So, the Brotherhood filed this lawsuit, alleging that Union Pacific violated the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, by unilaterally abrogating the 2001 CBA. Filing 40 at 13.

Union Pacific has moved to dismiss the complaint for lack of subject matter jurisdiction. *See* filing 51 at 2. The Brotherhood has also moved for summary judgment. Filing 46. For the reasons set forth below, the Court will grant Union Pacific's motion to dismiss and deny the Brotherhood's motion for summary judgment.

## STANDARD OF REVIEW

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008).

A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack'" and a "factual attack." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In a facial attack, the Court merely needs to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. *Id.* Accordingly, the Court would restrict itself to the face of the pleadings and the non-moving party would receive the same protections as it would defending against a motion brought under Rule 12(b)(6)—that is, the Court would accept all factual allegations in the pleadings as true and view them in the light most favorable to the nonmoving party. *Id.*; *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

Conversely, in a factual attack, the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, may be considered. *Branson Label*, 793 F.3d at 914. Thus, the nonmoving party would not enjoy the benefit of the allegations in its pleadings being accepted as true by the reviewing court. *Id.* But factual challenges do not arise only when a court considers matters outside the pleadings. *Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002). A district court engages in a factual review when it inquires into and resolves factual disputes. *Id.*

The Court, in this instance, determines that Union Pacific is advancing a "factual attack" to subject matter jurisdiction. *Id.* Accordingly, the Court will consider matters outside the pleadings without giving the Brotherhood the benefit of its pleadings being accepted as true.

## DISCUSSION

This dispute is governed by the Railway Labor Act (RLA). The RLA obligates unions and employers to negotiate disputes. *United Transp. Union v. Kansas City S. Ry.*, 172 F.3d 582, 585 (8th Cir. 1999); *Sheet Metal Workers'*

*Int'l Ass'n v. Burlington N. R.R.*, 893 F.2d 199, 202 (8th Cir. 1990). If negotiation fails, the dispute takes one of two courses, depending upon whether the dispute is characterized as "major" or "minor." [1] *Kansas City S. Ry.*, 172 F.3d at 585; *Sheet Metal Workers*, 893 F.2d at 202. The distinction is important because the Court lacks jurisdiction over minor disputes—which must be submitted to binding arbitration. *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001); *see also Mo. Pac. R.R. v. United Transp. Union*, 782 F.2d 107, 110 (8th Cir. 1986).

So, as a threshold matter, the Court must first determine whether it has jurisdiction to hear the dispute (*i.e.*, the dispute is major) or whether the Court lacks jurisdiction and the case must be submitted to arbitration (*i.e.*, the dispute is minor). There is no bright-line rule for differentiating between major and minor disputes. *Kansas City S. Ry.*, 172 F.3d at 585-86. In general, major disputes seek to create contractual rights, while minor disputes seek to enforce them. *Id.* at 586. Major disputes involve questions relating to the formation of, or efforts to secure, labor agreements. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past. *Kansas City S. Ry.*, 172 F.3d at 586. For instance, a dispute is major if one party seeks to change the rates of pay, rules, or working conditions in a manner not contemplated by the CBA. *Sheet Metal Workers*, 893 F.2d at 202. They arise where there is no such agreement, or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. *Id.* (citing *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945)).

---

[1] The terms "major" and "minor" do not appear in the RLA itself; they are judicially created nomenclature. *Kansas City S. Ry.*, 172 F.3d at 585 n.1; *Sheet Metal Workers*, 893 F.2d at 202 n.2. They are simply a "shorthand method of describing two classes of controversy Congress had distinguished in the RLA." *Consol. Rail Corp.*, 491 U.S. at 302.

In contrast, minor disputes involve the interpretation of existing agreements. *Kansas City S. Ry.*, 172 F.3d at 586. They contemplate the existence of a collective bargaining already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. *Sheet Metal Workers*, 893 F.2d at 202. Characterizing the nature of the dispute depends on whether it is arguably comprehended within the agreement of the parties. *Kansas City S. Ry.*, 172 F.3d at 586. "The distinguishing feature of such a case is that the dispute may be conclusively resolved by interpreting the existing agreement." *Consol. Rail Corp.*, 491 U.S. at 305. Stated differently, a minor dispute does not involve rights that exist independent of the CBA. *Bhd. of Maint. of Way Emps.*, 596 F.3d at 1223.

In determining whether a dispute is major or minor, the Court must determine the terms of the agreement, including the written CBA and the parties' past practices. *Kansas City S. Ry.*, 172 F.3d at 586. It is important to stress, however, that the Court need not interpret the terms of the agreement. *Id.* The purpose of the inquiry, rather, is to determine whether the case implicates a question of contract interpretation. *Id.*; *Carmen*, 944 F.2d at 1427. And once the Court determines the terms of the agreement, it must then determine whether the particular dispute is comprehended within that agreement. *Kansas City S. Ry.*, 172 F.3d at 586.

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Consol. Rail Corp.*, 491 U.S. at 307; *accord Carmen*, 944 F.2d at 1427.

In this case, the Brotherhood does not dispute that the parties' disagreement is controlled by the 2001 CBA. In fact, the Brotherhood expressly argues that Union Pacific violated the RLA by utilizing technology to perform tasks arguably reserved to the Brotherhood's forces by the 2001 CBA. Filing 57 at 20-22. But the Brotherhood does claim that Union Pacific's contrary interpretation of the CBA is frivolous or obviously insubstantial. Filing 57 at 22-25. Therefore, the Brotherhood asserts, Union Pacific is in effect attempting to unilaterally impose new contractual terms, and the dispute is major. *See Consol. Rail Corp.*, 491 U.S. at 306-07.

The issue before the Court, then, is whether Union Pacific's understanding of the 2001 CBA can be reasonably justified. Formulations of this inquiry have differed over time and among the circuits: phrases such as "not arguably justified," "obviously insubstantial," "spurious," and "frivolous" have been employed. *Kansas City S. Ry.*, 172 F.3d at 586; *see also Sheet Metal Workers*, 893 F.2d at 203. For example, a case is deemed minor if the railroad's assertion that the dispute implicates a question of contract interpretation is not obviously insubstantial. *Kansas City S. Ry.*, 172 F.3d at 586. The differences between these formulations are not critical; each illustrates the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA. *Id.*; *see Consol. Rail Corp.*, 491 U.S. at 306-07.

Union Pacific makes two arguments to support why, in its view, its understanding of the 2001 CBA is arguably justified. First, Union Pacific claims that the parties' February 7th Agreement allows Union Pacific to make "technological, operational, and organizational changes" to its rail systems even if that technology eliminates work reserved for the Brotherhood's employees. Filing 40 at 11; filing 47-2 at 67. And because tie plating and panel

fabrication can be done using robotics technology, Union Pacific argues, the 2001 CBA does not, and cannot, prohibit its use. Filing 47-1 at 7.

Union Pacific bolsters that understanding of the 2001 CBA with its second argument—that the parties' past practice evinces an implied agreement allowing technology to eliminate work typically reserved for the Brotherhood's forces. *See* filing 52 at 11. To support that contention, Union Pacific points to at least three occasions where advanced technology eliminated union work and the Brotherhood acquiesced to its use. The first instance occurred in 2004, when Union Pacific began using "CNC machines" to drill holes into wooden ties for plate attachment. Filing 47-2 at 80. The "CNC machine" replaced the manual drilling work previously performed by the Brotherhood's members. Filing 47-2 at 80; filing 54-1 at 5-6. And a few years later, Union Pacific also opted for use of a "PLUS Train" which uses GPS technology to determine how much ballast[2] is needed in a given area. Filing 47-2 at 80; filing 54-1 at 6. Before the "PLUS Train," union members would walk along side the ballast car manually opening and closing the doors to allow the correct amount of ballast to fall to the ground. *See* filing 52 at 11. And between 2014 and 2017, Union Pacific alleges it installed at least 155[3] machine-plated switches—replacing the fabrication steps of affixing plates to ties previously performed by the Brotherhood's members. Filing 54-1 at 8.

---

[2] Track ballast, which is typically made of crushed stone, forms the trackbed upon which railroad ties are laid and is used to bear the load from the railroad ties, to facilitate drainage of water, and to reduce vegetation that might interfere with the track structure. Filing 54-1 at 6 n.1.

[3] The Court notes that originally, Union Pacific claimed that over 200 machine-plated switches had been installed. *See* filing 54-1 at 8. But later, Union Pacific corrected that number to 155 machine-plated switches. *See* filing 61 at 12 n.5.

In other words, Union Pacific claims that there are at least three examples—spanning at least a decade—where work arguably protected by Rule 9 was eliminated by technology. That evidence, Union Pacific contends, supports its understanding that the 2001 CBA does not reserve *every* aspect of track construction for employees represented by the Brotherhood. Filing 40 at 11; filing 47-2 at 67. And because it is entirely proper to rely on the parties' past practice when determining the terms of the parties' agreement, Union Pacific argues that its interpretation of the 2001 CBA is not "frivolous" or "obviously insubstantial," making this dispute minor. *See Kansas City S. Ry.*, 172 F.3d at 586; *see also Sheet Metal Workers*, 893 F.2d at 203.

The Brotherhood disagrees. Filing 57 at 24-25. Specifically, the Brotherhood points to the explicit language of Rule 9, reserving the "[c]onstruction and maintenance of roadway and track, such as rail laying, tie renewals, ballasting, surfacing and lining track, fabrication of track panels, maintaining and renewing frogs, switches, railroad crossing, etc., repairing existing right of way fences . . . [for Union] forces . . . ." Filing 47-1 at 16. And the Brotherhood understands this provision as reserving every aspect of rail construction work for the Brotherhood's members. *See* filing 57 at 22.

The Brotherhood also takes issue with Union Pacific's contention that its repeated use of technology constitutes a past practice so long standing that it has ripened into a binding practice. Filing 57 at 24; *see Bhd. Ry. Carmen of U.S. & Canada, Div. of Transp. Commc'ns Union v. Missouri Pac. R. Co.*, 944 F.2d 1422, 1429 (8th Cir. 1991), *Alton & S. Lodge No. 306 v. Alton & S. Ry.*, 849 F.2d 1111, 1114 (8th Cir. 1988), cert. denied, 492 U.S. 905 (1989); *Bhd. of Maint. of Way Emps., Lodge 16 v. Burlington N. R.R.*, 802 F.2d 1016, 1022 (8th Cir. 1986); *see also Sheet Metal Workers*, 893 F.2d at 203-04. Generally speaking, the Brotherhood suggests that the examples of technology relied on

by Union Pacific are neither relevant nor compelling evidence to suggest that the parties' have a "binding" past practice. Filing 57 at 24-31.

For example, the Brotherhood argues that allowing "CNC Machine" to replace union work for "ballast distribution" is distinguishable from the current case. That is true, the Brotherhood claims, because ballast work is extremely dangerous—making the use of technology mutually beneficial to the Brotherhood's employees. Filing 57 at 31. Relatedly, the Brotherhood distinguishes its use of pre-plated ties by arguing that such technology was only used at one location and in accordance with a specific written agreement not applicable here. Filing 57 at 29. Lastly, the Brotherhood argues that it was not aware that Union Pacific attempted to install machine-plated switches at least 155 times—making it impossible for the Brotherhood to acquiesce to such conduct. *See* filing 57 at 23-25.

And while those arguments might ultimately be well taken, it is not the Court's task to determine which party's understanding of the parties past practice is more persuasive. It is to determine whether Union Pacific has met its relatively light burden of showing that its reading of the parties' CBA is arguably justified by the parties' written agreements and past practices. *See Bhd. v. Maint. of Way Emps.*, 596 F.3d at 1223. And, the Court notes, if doubt arises about the classification of a dispute, the dispute is to be considered minor. *See id.* at 639; *see also Kansas City S. Ry.*, 172 F.3d at 588.

With those guiding principles in mind, the Court finds that Union Pacific's understanding of the 2001 CBA is neither "frivolous" nor "obviously insubstantial." *Sheet Metal Workers*, 893 F.2d at 205. Union Pacific has provided the Court with evidence suggesting that on several occasions—and over the course of several years—the Brotherhood allowed Union Pacific to implement technology eliminating work previously reserved for the Brotherhood. *See* Filing 54-1. That evidence is sufficient to justify Union

Pacific's position that the parties had an implied understanding allowing advanced technology use. *See Consol. Rail Corp.*, 491 U.S. at 306 (determining that the type of practice relied on need not be identical to the challenged practice to satisfy the burden of showing arguable contractual justification); *see also Bhd. Ry. Carmen*, 944 F.2d at 1429. And that understanding is, at least arguably, further supported by the existence of the parties' written agreement permitting technological advances to Union Pacific's operations.[4] *See* Filing 47-2 at 67; filing 54-1 at 73.

Stated differently, Union Pacific has demonstrated that despite the broad language of Rule 9, the parties' past practice and earlier agreements plausibly support its understanding that 2001 CBA does not prohibit its use of robotics technology for track construction. Filing 47-2 at 67; filing 54-1 at 73. In light of that evidence, the Court cannot say that Union Pacific's contract interpretation—although it may be questionable and *might* ultimately be wrong—is frivolous. *See Sheet Metal Workers*, 893 F.2d at 205.

In sum, the Court finds that Union Pacific has met its relatively light burden of establishing the parties' dispute is comprehended by the parties' written agreements and their past practices. *Consol. Rail Corp.*, 491 U.S. at 316; *Kansas City S. Ry.*, 172 F.3d at 586; *Sheet Metal Workers*, 893 F.2d at 203;

---

[4] The Court acknowledges the Brotherhood's argument that because Union Pacific's theory that pre-fabricated panels are allowed under the 2001 CBA has been rejected in several arbitration awards, its interpretation of the agreement is "frivolous." Filing 57 at 22-27. The Court is not persuaded. If anything, the existence of arbitration awards—pertaining to the same subject matter at issue here—actually supports the Court's conclusion that the dispute is minor and subject to arbitration. *See generally Bhd. of Maint. of Way Employes Div./IBT v. Union Pac. R. Co.*, 460 F.3d 1277, 1284 (10th Cir. 2006) (affirming the District Court's finding that the parties' dispute over pre-plated rail ties was "minor"); *see also* filing 54-1 at 21-68.

*Bhd. of Maint. of Way Emps. Div. of Int'l Bhd. of Teamsters v. Union Pac. R. Co.*, 475 F. Supp. 2d 819, 843 (N.D. Iowa 2007). As such, the parties' dispute is minor and subject to exclusive arbitral jurisdiction under the RLA. *Id.*

The Court will grant Union Pacific's motion to dismiss for lack of subject matter jurisdiction. *Consol. Rail Corp.*, 491 U.S. at 306; *Bhd. Ry. Carmen*, 944 F.2d at 1427. Having reached that conclusion, the Court need not consider the Brotherhood's motion for summary judgment, and the Brotherhood's complaint is dismissed in its entirety.

IT IS ORDERED:

1. Union Pacific's motion to dismiss (filing 51) is granted.

2. The Brotherhood's motion for summary judgment (filing 46) is denied.

3. A separate judgment will be entered.

Dated this 12th day of October, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge